UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MAKARAND GADRE,

                      Plaintiff,

-v-

HEXANIKA, INC.,

                      Defendant.

21-CV-11221 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

Plaintiff Makarand Gadre brings this action against Defendant Hexanika, Inc. ("Hexanika") to recover unpaid wages and other compensation. (ECF No. 2 ("Compl.").) Hexanika asserts counterclaims for breach of contract, unjust enrichment, and fraud. (ECF No. 40 ("Countercl.").) Before the Court is Gadre's motion for summary judgment on Hexanika's counterclaims. For the reasons that follow, the motion is granted with respect to Hexanika's fraud claim and denied with respect to Hexanika's breach of contract and unjust enrichment claims.

I.  **Background**

    A.  **Factual Background**

The following facts are taken from Gadre's Local Rule 56.1 Statement (ECF No. 64), Hexanika's Response to Gadre's Local Rule 56.1 Statement (ECF No. 69)[1], and the underlying evidence cited therein, and are construed in the light most favorable to the non-movant.

---

[1] Hexanika states in its Response to Gadre's Local Rule 56.1 Statement that it "still disputes jurisdiction and venue in this Court," despite having filed no motion directed to those issues. (ECF No. 69 ¶ 3.) There is a close question regarding subject matter jurisdiction. "We have diversity jurisdiction over cases between citizens of the United States and citizens of foreign states, but we do not have diversity jurisdiction over cases between aliens." *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 49-51 (2d Cir. 2012) (diversity jurisdiction would not extend to a case between a German citizen and a Delaware

Gadre contends that he worked for Hexanika as a consultant and Chief Technology Officer ("CTO") from 2015 to 2021, from which Hexanika owes him $120,500 in unpaid monthly wages. (ECF No. 64 ¶¶ 4-5.) By contrast, Hexanika contends that Gadre contracted to work for it only in 2015, 2017, 2019, 2020, and 2021. (ECF No. 69 ¶ 4.) Hexanika maintains that it "paid Gadre for all services actually rendered by Gadre and for which Hexanika received payment from clients," as required by the parties' contracts. (*Id.* ¶ 5.)

Hexanika provides additional evidence as follows.

### 1.   2015 Agreement

Hexanika, Inc. is a software development and services provider, incorporated in Delaware on January 31, 2014. (ECF No. 68 ("Pandit Aff.") ¶ 3.) Around that time, Hexanika's CEO, Yogesh Pandit, became acquainted with Gadre, who had worked at Microsoft for nearly two decades. (*Id.* ¶ 4.) On January 1, 2015, Gadre entered into a one-year agreement to serve as Hexanika's CTO and to provide consulting services, including "software architecture, software design, infrastructure planning, and hiring personnel" ("2015 Agreement"). (*Id.* ¶ 5 (capitalization omitted); *see* ECF No. 68-2 at 14.) The 2015 Agreement provided that "[Gadre]

---

corporation with its principal place of business in Japan under 28 U.S.C. § 1332(c)(1) as amended in 2011); *cf. Int'l Shipping Co., S.A. v. Hydra Offshore, Inc.*, 875 F.2d 388 (2d Cir. 1989) ("[E]ven if a [foreign] corporation . . . is considered a citizen of [a U.S.] State, diversity i[s] nonetheless defeated if another alien party is present on the other side of the litigation."). Gadre is domiciled in India. (Compl. ¶ 4.) Gadre alleges that Hexanika is a Delaware corporation with a principal place of business in Arkansas. (*Id.* ¶ 5.) Hexanika states that it has principal places of business in both Arkansas and India. (ECF No. 69 ¶ 3.) A corporation's principal place of business is "a *single* place" where its "officers direct, control, and coordinate the corporation's activities"—referred to as the "nerve center." *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010) (emphasis added). Because Hexanika's CEO, Yogesh Pandit, moved to Arkansas in January 2021, before this case was filed (ECF No. 68-3 at 9; *see* Compl.), and given Hexanika's acknowledgment that Arkansas is one of its two "principal places of business" (ECF No. 69 ¶ 3), Gadre's allegations appear to be sufficient to support subject matter jurisdiction under § 1332, and Hexanika has not adequately challenged subject matter jurisdiction.

shall use [his] best efforts to perform the Services such that the results are satisfactory to Hexanika." (ECF No. 68-2 at 1.) It also required Gadre to obtain insurance coverage upon Hexanika's request. (*Id.* at 9.) Gadre would receive a monthly fee of $3,500 for working no less than twenty hours per week, although "Hexanika shall be obligated to pay only for actual Service rendered." (*Id.* at 2, 15.) Part of Gadre's compensation comprised "sweat equity," in the form of stock options. (Pandit Aff. ¶ 9; *see* ECF No. 68-4.) In accordance with its termination provision, the 2015 Agreement "continued beyond expiration of the one-year term as the projects were incomplete." (Pandit Aff. ¶ 13.)

During this period, Gadre helped Hexanika develop SmartJoin, an automated data management software, and SmartReg, a regulatory reporting software. (*Id.* ¶¶ 10-12.) In October 2016, a mentor to Hexanika provided feedback for SmartJoin that "there is still a great deal of work needed . . . if your customers are going to have any chance of operating your solution." (*Id.* ¶ 14; *see* ECF No. 68-6.)

   **2.**  **2017 Agreement**

On September 1, 2017, Hexanika and Gadre entered into a new one-year agreement that raised Gadre's monthly pay to $7,500 ("2017 Agreement"). (Pandit Aff. ¶ 16; *see* ECF No. 68-8.) It included a new provision that "the receipt by Hexanika of payment from Client for [Gadre's] Services and/or Expenses is a condition precedent to Hexanika's obligation to make payment to [Gadre]." (ECF No. 68-8 at 3.)

Around late 2017 and early 2018, Gadre began building SmartComply, a business compliance software, for Hexanika. (Pandit Aff. ¶ 15.) According to Hexanika, all three products designed by Gadre and his team "were continually failing [internal] tests." (*Id.*; *see* ECF No. 68-7 at 1.)

### 3. 2018 and 2020 Agreements

On September 18, 2018, Hexanika and Gadre executed an amendment to their original 2015 Agreement, extending its terms to cover the period from July 1, 2018, to December 31, 2018 ("2018 Agreement"). (Pandit Aff. ¶ 17; *see* ECF 68-9.) On June 8, 2020, they agreed to further extend the 2015 Agreement to cover the period from January 1, 2019, to December 31, 2020 ("2020 Agreement"). (Pandit Aff. ¶ 23; *see* ECF 68-12.)

In December 2019, Hexanika formally launched its first product, SmartJoin, and it launched SmartComply shortly thereafter. (Pandit Aff. ¶ 20.) However, Pandit found that "major problems with SmartJoin started emerging" as soon as January 2020. (*Id.* ¶ 21; *see* ECF Nos. 68-10, 68-11.) On June 14, 2020, Hexanika's client RSM encountered problems with SmartJoin's data linking process, which lacked a "client-specific quick fix" and "needed to be addressed at the product level." (Pandit Aff. ¶ 24.) A few days later, Hexanika's Executive Vice President reported that "the call with RSM was most embarrassing for me as our product failed to do some basic functions." (ECF No. 68-14 at 1.) RSM threatened to cancel its contract with Hexanika if the code was not fixed. (*See id.*; Pandit Aff. ¶ 26.) In August 2020, Pandit discussed issues encountered by multiple clients, reporting that "[w]e can't show demos and we ended up spending [a] lot of money maintaining different versions." (ECF No. 68-20 at 1.) According to Pandit, despite Hexanika's request that Gadre fix the coding problems, "he never did so." (Pandit Aff. ¶ 26.) Around the third quarter of 2020, "another Hexanika client, FPG, cancelled its contract commitment as well." (*Id.* ¶ 28.) Pandit states that Gadre "refuse[d] to take responsibility for these failures," "would not turn over [his] code for other engineers to repair and integrate," and "did not repair it himself." (*Id.* ¶ 29.) In November 2020, Hexanika commenced "code clean up and refactoring projects . . . to repair the broken codes underpinning the flawed softwares," which led RSM to renew its contract with Hexanika. (*Id.* ¶ 30; *see* ECF

No. 68-19.) Throughout this process, Pandit had to "reallocat[e] resources to fix problems, not paying [himself] and paying contractors from [his] own personal savings." (Pandit Aff. ¶ 31). Gadre, on the other hand, worked fewer hours and blamed others for client disappointments. (*Id.* ¶ 32.)

### 4. 2021 Agreement

On January 1, 2021, Hexanika and Gadre entered into another one-year agreement, under which Gadre would receive a lowered monthly payment of $1,000 ("2021 Agreement"). (*Id.* ¶ 33; ECF No. 68-22 at 13.) Similar to the 2015 Agreement, it provided that "Hexanika shall be obligated to pay only for actual Service rendered." (ECF No. 68-22 at 2.)

While Hexanika paid Gadre approximately $157,000 between 2018 and 2020, Hexanika's payments fell behind as COVID-19 hit and businesses struggled. (*See* ECF No. 68-23 at 2; ECF No. 68-21 at 5.) During this period, Gadre and his wife repeatedly demanded that Hexanika immediately transfer unpaid wages or face litigation. (*See* ECF Nos. 68-21, 68-24, 68-25.) In 2021, after Hexanika engaged in lengthy negotiations with a prospective client, Citibank, "the Citibank team indicated there were risks and chose not to proceed with a contract," which Pandit attributed to "the reputational damage that this litigation presents when [Hexanika seeks] new business." (Pandit Aff. ¶¶ 31, 48). In addition, Hexanika learned that "Gadre had not obtained insurance coverage as requested." (*Id.* ¶ 39; ECF No. 68-1 at 57.) In May 2021, Gadre quit working for Hexanika. (Pandit Aff. ¶ 41).

### B. Procedural History

Gadre filed this action on January 3, 2022, alleging violations of the New York Freelance Isn't Free Act, breach of contract, and promissory estoppel. (Compl.) Hexanika answered on April 6, 2023, asserting counterclaims for breach of contract, unjust enrichment, and fraud. (Countercl.) On December 1, 2023, Gadre moved for summary judgment dismissing all of

Hexanika's counterclaims. (ECF No. 65.) Hexanika filed an opposition on December 15, 2023 (ECF No. 66), and Gadre filed a reply on December 22, 2023 (ECF No. 70).

## II.     Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In deciding a motion for summary judgment, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995).

"Summary judgment is mandated against 'a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Mejia v. Roma Cleaning, Inc.*, 751 F. App'x 134, 135-36 (2d Cir. 2018) (summary order) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. After the moving party "point[s] out to the district court . . . that there is an absence of evidence to support the nonmoving party's case," the burden shifts to "the nonmoving party to go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial." *Id.* at 324-25 (quotation marks omitted).

### III.  Discussion

#### A.  Breach of Contract

Hexanika alleges that Gadre "breached his contract with [Hexanika] by failing to perform work in a workmanlike manner as agreed despite [Hexanika's] payment for services for same." (Countercl. at 13.)  Under New York law,[2] the essential elements of a breach of contract claim are "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).  Hexanika has produced sufficient evidence to at least create genuine issues for trial regarding each of these elements.

##### 1.  Gadre's Breach

It is clear that at least five contracts existed between Gadre and Hexanika, entered into in 2015, 2017, 2018, 2020, and 2021 (collectively, "Agreements").  (ECF Nos. 68-2, 68-8, 68-9, 68-12, 68-22.)  Hexanika contends that Gadre breached all of them by failing to "design and deliver functioning software."  (Pandit Aff. ¶ 48.)

The 2015, 2018, 2020, and 2021 Agreements each contain a provision that "[Gadre] shall use [his] best efforts to perform the Services such that the results are satisfactory to Hexanika." (ECF No. 68-2 at 1; ECF No. 68-22 at 1; *see* ECF Nos. 68-9, 68-12.)  All Agreements also contain Gadre's representation and warranty that "he and/or his Personnel assigned to perform Services shall have the proper skill, training and background so as to be able to perform in a

---

[2] All of the Agreements provide that: "This Agreement and all matters relating to or arising under this Agreement shall be governed in all respects by the laws of the State of New York, without giving effect to principles of conflicts of law." (ECF No. 68-2 at 12; ECF No. 68-8 at 14; ECF No. 68-22 at 11.)  The parties do not dispute the application of New York law.

7

competent and professional manner and so that all work shall be so performed in a manner compatible with Hexanika's or its client's business operations." (ECF No. 68-2 at 6; ECF No. 68-8 at 8; ECF No. 68-22 at 6; *see* ECF Nos. 68-9, 68-12.) To support its allegation of Gadre's breach, Hexanika submits evidence that the software products designed by Gadre "were continually failing [internal] tests" (Pandit Aff. ¶ 15; *see* ECF No. 68-7), "failed to do some basic functions" due to broken coding (ECF No. 68-14), and caused clients to cancel or threaten to cancel contracts with Hexanika (Pandit Aff. ¶¶ 27, 30)—all of which Gadre did not take steps to fix despite "numerous asks" by Hexanika (*id.* ¶¶ 26, 29). In addition, Gadre had not "maintain[ed] liability insurance coverage for [his] consulting work" upon request by Hexanika (ECF No. 68-1 at 57; *see id.* ¶ 39), as required by the Agreements (ECF No. 58-2 at 9; ECF No. 58-8 at 12; ECF No. 58-22 at 10; *see* ECF Nos. 68-9, 68-12). The evidence raises a triable issue as to whether Gadre breached the Agreements by failing to use his best efforts to perform software design services.

    2.  **Hexanika's Performance**

Gadre also argues that "Hexanika failed to present any evidence that it adequately performed under the consulting agreement that it alleges Gadre breached because it failed to present any evidence that it made payments to Gadre." (ECF No. 70 at 6.) This argument is not appropriate for summary judgment for three reasons.

First, Hexanika submitted an Excel sheet—contained in an email attachment transmitted by Gadre—which tends to show that Hexanika paid Gadre $157,000 between January 1, 2018, and November 1, 2020. (*See* ECF No. 68-23.) Based on the 2017, 2018, and 2020 Agreements, Gadre would be entitled to somewhere between $143,000 and $255,000 from that time period if

he had performed all requisite services.[3]  (*See* ECF No. 68-2 at 15; ECF No. 68-8 at 3; ECF 68-9; ECF 68-12.)  This raises a genuine dispute regarding whether Hexanika's payments constitute adequate performance under the Agreements.

Second, all of the Agreements provided that "Hexanika shall be obligated to pay only for actual Service rendered."  (ECF No. 68-2 at 2; ECF No. 68-8 at 4; ECF No. 68-22 at 2; see ECF Nos. 68-9, 68-12.)  The 2017 Agreement further provided that "the receipt by Hexanika of payment from Client for [Gadre's] Services and/or Expenses is a condition precedent to Hexanika's obligation to make payment to [Gadre]."  (ECF No. 68-8 at 3.)  Given the dispute over the competency of Gadre's work and the amount of actual services he rendered, Hexanika may not be obligated to pay the full amount pursuant to the terms of the Agreements.

Finally, "[u]nder New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach."  *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) (citing *Hadden v. Consol. Edison Co. of N.Y.*, 356 N.Y.S.2d 249 (1974)).  "The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain."  *Id.* at 186-87 (citing *Anderson Clayton & Co. v. Alanthus Corp.*, 457 N.Y.S.2d 578 (2d Dep't 1983)).

---

[3] Gadre's monthly fee under the 2017 Agreement was $7,500.  His monthly fee under the 2018 and 2020 Agreements, which extended the 2015 Agreement, appears to have been $3,500.  The 2017 Agreement was effective as of September 1, 2017 and "unless terminated earlier . . . , will continue for a period of one (1) year," but it could remain in effect beyond the one-year term until "the expiration or termination of the last Project Assignment." (ECF No. 68-8 at 2.)  At the upper limit, if the 2017 Agreement remained in effect all the way until October 2020, Gadre would be entitled to $7,500 × 34 months = $255,000.  At the lower limit, if the 2017 Agreement was superseded when the 2018 Agreement took effect on July 1, 2018 (*see* ECF No. 68-9), Gadre would be entitled to $7,500 × 6 months + $3,500 × 28 months = $143,000.

Given the factual uncertainties surrounding Gadre's alleged breach, the Court cannot conclude as a matter of law whether Hexanika was excused from performance.

### 3. Damages

Finally, Gadre contends that Hexanika "makes no attempt to articulate what damages it purportedly experienced, much less cite evidence to support any calculation of damages." (ECF No. 70 at 4.) As an initial matter, Hexanika has certainly adduced *some* evidence relating to damages. For example, Pandit's affidavit and deposition indicate that had Gadre used his best efforts to design software as required by the Agreements, Hexanika would not have needed to hire new people and reallocate resources for "code clean up and refactoring projects . . . to repair the broken codes," which Hexanika estimated to have cost it $160,000. (Pandit Aff. ¶ 30; ECF No. 68-3 at 44; *see* ECF No. 68-19.) Moreover, Hexanika's exhibits show that it has provided Gadre with substantial compensation, which would have been unwarranted if Gadre had failed to render "actual Service" pursuant to the Agreements. (*See* ECF No. 68-23; ECF No. 68-4; ECF No. 68-18 at 2.) In his deposition, Pandit also states that a client, FPG, cancelled a $78,000 contract with Hexanika midway through because the software designed by Gadre "stopped functioning." (ECF No. 68-3 at 49-50.) These are all potential damages that Hexanika may have suffered as a result of Gadre's deficient performance of his contractual obligations. Thus, there is not a "complete failure" to prove damages by Hexanika. *Celotex Corp.*, 477 U.S. at 323.

Beyond this threshold observation, the Court declines to decide issues of damages at this stage. Because it is unclear at this point who is liable for breach, the Court concludes that Gadre's "motion is premature because [it] seeks an adjudication on damages prior to a determination of liability," and it "is axiomatic that summary judgment as to damages can only follow a determination that damages are in fact owed (*i.e.*, that the defendant is actually liable for damages)." *Lovely H. v. Eggleston*, No. 05-CV-6920, 2012 WL 4459463, at *2 (S.D.N.Y. Sept.

19, 2012). Thus, when "neither party's liability has been finally adjudicated," as is the case here, courts have determined that "analysis of damages [is] premature." *Delshah 60 Ninth, LLC v. Free People of PA, LLC*, No. 20-CV-5905, 2022 WL 4228213, at *20 (S.D.N.Y. June 29, 2022) (quoting *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 450-51 n.6 (S.D.N.Y. 2014)); *see also Capitol Vial, Inc. v. Int'l Bioproducts, Inc.*, 980 F. Supp. 628, 634 (N.D.N.Y. 1997) (determining that a party's motion for "partial summary judgment to limit the amount of damages for which it can possibly be held liable" was premature because the court had "found genuine issues of material fact surrounding possible breaches by both parties"); *Gen. Elec. Co. v. APR Energy plc*, No. 19-CV-3472, 2021 WL 2418586, at *15 (S.D.N.Y. June 11, 2021) ("[U]ntil liability has been adjudicated, the issue of damages is not ripe and may ultimately be moot.").

Gadre's motion for summary judgment on Hexanika's breach of contract claim is denied.

### B.     Unjust Enrichment

Hexanika also alleges that Gadre "has been unjustly enriched for payments received under the terms of the service agreement where [Hexanika] was forced to expend additional monies in the procurement of a third-party to remedy those services breached by [Hexanika] in regard to the underlying project." (Countercl. ¶ 43.) "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).

Under New York law, although relief on a theory of unjust enrichment "is unavailable where . . . an express contract covers the subject matter," *Karmilowicz v. Hartford Fin. Servs. Grp., Inc.*, 494 F. App'x 153, 157 (2d Cir. 2012) (summary order), it is available as an alternative claim to breach of contract when a contract is determined not to govern, *see Newman*

11

*& Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 663 (2d Cir. 1996). Here, Gadre states that he worked for Hexanika from 2015 to 2021, while Hexanika states that Gadre contracted to provide services to it only in 2015, 2017, 2019, 2020, and 2021. (*See* ECF No. 69 ¶ 4.) The Agreements submitted by the parties do not expressly cover the time period from January 1, 2016, to August 31, 2017. (*See* ECF 68-2 at 1; ECF No. 68-8 at 1.) Thus, certain work that Gadre performed for Hexanika may not fall under the scope of express contracts between the parties. Although Hexanika "cannot recover twice for the same injuries, New York law entitles a plaintiff to assert alternative theories of liability." *Trump Int'l Hotel & Tower v. Carrier Corp.*, 524 F. Supp. 2d 302, 314 (S.D.N.Y. 2007). Because Hexanika has put forth evidence that it transferred payments to Gadre while Gadre had not fulfilled his job duties, the motion for summary judgment on Hexanika's unjust enrichment claim is denied.

    **C.**    **Fraud**

Under New York law, a plaintiff alleging fraud must prove five elements by clear and convincing evidence: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006). Hexanika alleges that Gadre "purposefully misrepresented that [Hexanika] executed a second service agreement in order to cause [Hexanika] to commit to repayment of alleged monies." (Countercl. ¶ 47.) However, neither Hexanika's Rule 56.1 Statement nor its supporting affidavit points to any evidence of material misrepresentation or omission of fact in relation to the service agreements that Gadre made with knowledge of its falsity and intent to defraud. (*See generally* ECF No. 69; Pandit Aff.) Therefore, Hexanika's fraud claim must be dismissed.

### IV. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment on Defendant's counterclaims is GRANTED in part and DENIED in part.

The Clerk of Court is directed to close the motion at Docket Number 65.

SO ORDERED.

Dated: September 24, 2024
      New York, New York

_____
J. PAUL OETKEN
United States District Judge